[No. S175204. Aug. 23, 2010.]

ALEJANDRA RUIZ et al., Plaintiffs and Respondents, v.
ANATOL PODOLSKY, Defendant and Appellant.

840

## Counsel

Cole Pedroza, Curtis A. Cole, Ashfaq G. Chowdhury; Schmid & Voiles, Susan Schmid and Denise H. Greer for Defendant and Appellant.

Hooper, Lundy & Bookman, Mark E. Reagan and Katherine R. Miller for California Association of Health Facilities as Amicus Curiae on behalf of Defendant and Appellant.

Tucker Ellis & West, E. Todd Chayet and Rebecca A. Lefler for California Medical Association, California Hospital Association and California Dental Association as Amici Curiae on behalf of Defendant and Appellant.

Marion's Inn, Kennedy P. Richardson, Yvonne M. Pierrou and Kathy Dong for Kaiser Foundation Health Plan, Inc., as Amicus Curiae on behalf of Defendant and Appellant.

Fred J. Hiestand for the Civil Justice Association of California as Amicus Curiae on behalf of Defendant and Appellant.

Center for Constitutional Litigation, John Vail; Cornelius P. Bahan, Inc., and Cornelius P. Bahan for Plaintiffs and Respondents.

## OPINION

**MORENO, J.**—For over 30 years, courts have been grappling with the following issue, appearing in various factual scenarios: when a person seeking medical care contracts with a health care provider to resolve all medical malpractice claims through arbitration, does that agreement apply to the resolution of wrongful death claims, when the claimants are not themselves signatory to the arbitration agreement? To resolve this issue, we must consider on the one hand the fact that wrongful death claims in the state are not derivative claims but are independent actions accruing to a decedent's heirs, as well as the fact that generally arbitration can be compelled only when a party has consented to the arbitration. On the other hand, we must address Code of Civil Procedure section 1295,[1] which as explained below, contemplates that all medical malpractice claims, including wrongful death claims, may be subject to arbitration agreements between a health care provider and the patient.

We hold that all wrongful death claimants are bound by arbitration agreements entered into pursuant to section 1295, at least when, as here, the language of the agreement manifests an intent to bind these claimants. This holding carries out the intent of the Legislature that enacted section 1295 and related statutes.

### I. FACTUAL BACKGROUND

The facts of this case relevant to this opinion are not in dispute. Rafael Ruiz attended an appointment at the office of Dr. Anatol Podolsky, an orthopedic surgeon, on July 17, 2006, about the treatment of a fractured hip. On the same day, they both signed a "Physician-Patient Arbitration Agreement." The agreement provided for the arbitration of any malpractice claims, consistent with the language of section 1295, further described below. The agreement further provided that it was the intention of the parties "that this agreement binds all parties whose claims may arise out of or relate to

---

[1] All statutory references are to this code unless otherwise indicated.

treatment or service provided by the physician including any spouse or heirs of the patient and any children, whether born or unborn, at the time of the occurrence giving rise to the claim." Elsewhere the agreement specifically provided for arbitration of wrongful death and loss of consortium claims.

Ruiz died on July 25, 2006. In July 2007, Alejandra Ruiz (the Wife) and the four adult children, Alejandro, Ana, Diana, and Samuel (collectively referred to as the adult children) filed an action against Podolsky, and other health care providers (who are not parties to this appeal), alleging claims for medical malpractice and wrongful death. They maintained that Podolsky and the other named defendants failed to adequately identify and treat Ruiz's hip fracture resulting in complications, and eventually his death.

Podolsky filed an answer to the complaint, and attached a copy of the arbitration agreement he made with Ruiz. A few months later, Podolsky filed a petition to compel arbitration. The Wife conceded she was subject to the arbitration agreement. However, she and the other heirs argued that because only one plaintiff was bound to arbitrate, the court should allow the parties to proceed in the trial court to avoid inconsistent verdicts, unnecessary delay, multiple actions, and duplicative discovery. Podolsky responded that the adult children were "swept up" into the arbitration agreement along with the Wife due to the "one action rule" for wrongful death suits.

The trial court disagreed. It denied the petition as to the adult children, and granted the petition as to the Wife. The court stayed the "action pending resolution of arbitration to avoid the possibility of inconsistent rulings." It set a date by which arbitration must be completed and also scheduled a postarbitration status conference date. Podolsky appealed the order denying arbitration. The Wife did not appeal.

The Court of Appeal concluded that the Wife was bound by the arbitration agreement through principles of equitable estoppel and invited error. Nonetheless, it concluded the trial court was correct to deny the petition to compel arbitration as to the adult children. It concluded that because the adult children had not consented to the arbitration, they were not now required to arbitrate. Nor did the Court of Appeal find any reason for compelling the adult children to arbitrate their claims simply because the Wife was so compelled. We granted review.

## II. THE STATUTORY BACKGROUND

Because the case requires us in some sense to reconcile the special health care arbitration statute with the wrongful death statute, we begin with a review of these two statutes.

## A. *Section 1295*

Section 1295, subdivision (a) provides: "Any contract for medical services which contains a provision for arbitration of *any dispute as to professional negligence of a health care provider* shall have such provision as the first article of the contract and shall be expressed in the following language: 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.' " (Italics added.)

Subdivision (b) of section 1295 states: "Immediately before the signature line provided for the individual contracting for the medical services must appear the following in at least 10-point bold red type: [¶] 'NOTICE: BY SIGNING THIS CONTRACT YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE 1 OF THIS CONTRACT.' "

As we stated in *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 577–578 [53 Cal.Rptr.3d 887, 150 P.3d 764] (*Reigelsperger*): "Section 1295 was enacted as part of the Medical Injury Compensation Reform Act of 1975 (MICRA). (Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, § 26.6, pp. 3975–3976.) MICRA was a response to a perceived crisis regarding the availability of medical malpractice insurance. 'The problem . . . arose when the insurance companies which issued virtually all of the medical malpractice insurance policies in California determined that the costs of affording such coverage were so high that they would no longer continue to provide such coverage as they had in the past. Some of the insurers withdrew from the medical malpractice field entirely, while others raised the premiums which they charged to doctors and hospitals to what were frequently referred to as "skyrocketing" rates. As a consequence, many doctors decided either to stop providing medical care with respect to certain high risk procedures or treatment, to terminate their practice in this state altogether, or to "go bare," i.e., to practice without malpractice insurance. The result was that in parts of the state medical care was not fully available, and patients who were treated by uninsured doctors faced the prospect of obtaining only unenforceable judgments if they should

suffer serious injury as a result of malpractice.' [Citation.] [¶] The purpose of section 1295 is to encourage and facilitate arbitration of medical malpractice disputes. [Citations.] Accordingly, the provisions of section 1295 are to be construed liberally." In other words, the encouragement of arbitration " 'as a speedy and relatively inexpensive means of dispute resolution' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899]) furthers MICRA's goal of reducing costs in the resolution of malpractice claims and therefore malpractice insurance premiums.

Because section 1295, subdivision (a) contemplates arbitration agreements to resolve disputes concerning "professional negligence," the definition of that term is particularly critical to the understanding of this case. "Professional negligence" is defined in section 1295, subdivision (g)(2) as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury *or wrongful death*, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital." (Italics added.)

### B. *The Wrongful Death Statute*

■ Section 377.60 authorizes a wrongful death action by specified persons including the decedent's spouse and children. "Unlike some jurisdictions wherein wrongful death actions are derivative, Code of Civil Procedure section 377.60 'creates a new cause of action in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived. [Citations.]' " (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283 [87 Cal.Rptr.2d 222, 980 P.2d 927], italics omitted (*Horwich*).)

As was stated in *San Diego Gas & Electric Co. v. Superior Court* (2007) 146 Cal.App.4th 1545, 1551 [53 Cal.Rptr.3d 722], any wrongful death recovery "is in the form of a lump sum verdict determined according to each heir's separate interest in the decedent's life [citation], with each heir required to prove his or her own individual loss in order to share in the verdict. (§ 377.61; [citation].) Because a wrongful death action compensates an heir for his or her own independent pecuniary losses, it is one for 'personal injury to the heir.' [Citations.] Thus, in a wrongful death action the 'injury' is not the general loss of the decedent, but the particular loss of the decedent to each individual claimant."

### III. The Case Law

Courts have long struggled with the issue of whether arbitration agreements between health care providers and patients bind spouses and children

of the patients who file wrongful death actions. A survey of the cases does not reveal a simple conflict, but rather a more complex taxonomy under varied factual circumstances.

In one camp are the health plan cases, in which one or more of the family members asserting the wrongful death claim belong to the same health plan as the decedent, and in which the decedent signed the arbitration agreement on behalf of himself and those other family members. In *Hawkins v. Superior Court* (1979) 89 Cal.App.3d 413 [152 Cal.Rptr. 491], the decedent had enrolled himself and his family in the Kaiser Foundation Health Plan. (*Id.* at p. 415.) He agreed to a contract containing an arbitration provision applying to " '[a]ny claim arising from the violation of a legal duty incident to this Agreement.' " (*Ibid.*) When he died of cancer his wife filed a wrongful death action against the plan and others and defendants petitioned to compel arbitration. The court affirmed that the wife was bound by the arbitration agreement signed by the husband. It acknowledged the general rule that "[a] person cannot be compelled to accept arbitration of a dispute he has not agreed to submit to arbitration." (*Id.* at p. 416.) But it recognized that the rule had been qualified. The *Hawkins* court relied on *Doyle v. Guiliucci* (1965) 62 Cal.2d 606 [43 Cal.Rptr. 697, 401 P.2d 1], in which this court held that a parent who contracted with a health plan to cover a minor child was empowered to bind the child to an arbitration agreement when the minor asserted a malpractice claim. (*Id.* at p. 610.) *Hawkins* also relied on *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699 [131 Cal.Rptr. 882, 552 P.2d 1178] (*Madden*), in which this court held that a state employee was bound by an arbitration provision that was part of an agreement negotiated between the health care plan and the State Employees Retirement System. Similarly, the decedent had the power to agree to a health care contract that would bind both his wife and himself. (*Hawkins, supra,* 89 Cal.App.3d at pp. 418–419.)

In *Herbert v. Superior Court* (1985) 169 Cal.App.3d 718 [215 Cal.Rptr. 477] (*Herbert*), perhaps the leading case in this area, petitioners were the widow and children of decedent Clarence Herbert. Herbert and his wife and five minor children were members of the Kaiser Foundation Health Plan. Herbert's three adult children were not members. He agreed to arbitrate malpractice claims and the question was whether his widow and children were bound by that agreement in a wrongful death action. (*Id.* at p. 720.)

The court first determined that the wife and minor children were bound to arbitrate under the reasoning of *Doyle* and *Hawkins* for reasons stated in those opinions. (*Herbert, supra,* 169 Cal.App.3d at p. 724.) The court then

considered whether the adult children not a part of the health plan should be bound by the arbitration agreement. The *Herbert* court concluded in the affirmative, for reasons both doctrinal and pragmatic: "The reasons requiring the nonsigning heirs to be bound by the agreement are far more convincing than any arguments in support of the trial court order that would require two separate and distinct proceedings. First, we cannot ignore the established law that a single cause of action exists in the heirs for the wrongful death of a decedent. (*Mayerhoff* v. *Kaiser Foundation Health Plan, Inc.* [(1977)] 71 Cal.App.3d 803 [138 Cal.Rptr. 319].) This requirement alone should prevent a splitting of the litigation into different tribunals where differing rulings and results could destroy the Legislature's policy enunciated in *Mayerhoff*. Second, it is obviously unrealistic to require the signatures of all the heirs, since they are not even identified until the time of death, or they might not be available when their signatures are required. Furthermore, if they refused to sign they should not be in a position possibly to delay medical treatment to the party in need. Although wrongful death is technically a separate statutory cause of action in the heirs, it is in a practical sense derivative of a cause of action in the deceased. Decedents are able to bind their heirs through wills and other testamentary dispositions so the concept is not new or illogical. Instead it is the only pragmatic solution in such a situation." (*Herbert, supra*, 169 Cal.App.3d at p. 725.)

Also critical to the *Herbert* court's determination was the enactment of section 1295, providing for arbitration of "professional negligence" claims, including wrongful death. "Subdivisions (a) through (c) of that section set forth strict requirements for a valid medical malpractice arbitration provision in an individual contract for medical services. Although these requirements are inapplicable to so-called 'health care service plans' such as Kaiser (Code Civ. Proc., § 1295, subd. (f)), this is only because such plans must contain alternative means for notifying plan members of arbitration provisions in the plan agreements. Under section 1295, arbitration of wrongful death or other professional negligence claims may not be compelled if the requirements of that section are not met. It logically follows that arbitration provisions may be enforced where, as here, proper notice of the arbitration provision is given." (*Herbert, supra*, 169 Cal.App.3d at pp. 726–727, fn. omitted; see also *Drissi v. Foundation Hospitals, Inc.* (N.D.Cal. 2008) 543 F.Supp.2d 1076 [following *Herbert*]; *Clay v. Permanente Medical Group* (N.D.Cal. 2007) 540 F.Supp.2d 1101, 1110–1111 [same].)

On the other hand, when a wrongful death or loss of consortium claim is asserted, but none of the plaintiffs are bound to the arbitration agreement by common plan membership, courts are divided as to whether nonsignatory plaintiffs are obliged to arbitrate. In *Baker v. Birnbaum* (1988) 202 Cal.App.3d

288 [248 Cal.Rptr. 336] (*Baker*) the wife brought suit against a health care provider for malpractice. Although she was a signatory to the arbitration agreement, the husband who sued for loss of consortium was not. Only the husband appealed from the trial court's order to arbitrate the loss of consortium claim. (*Baker, supra*, at p. 290.) Thus *Baker* unlike *Herbert* and *Hawkins* was not a wrongful death case.

After affirming that binding arbitration requires the consent of the parties, the *Baker* court distinguished *Hawkins*. The agreement in *Hawkins* was worded broadly to encompass all claims, whereas "Mrs. Baker contracted for medical care solely on her own behalf, and the agreement to arbitrate related only to such services as would be provided to her under that contract." (*Baker, supra*, 202 Cal.App.3d at p. 292.) The *Baker* court also distinguished *Herbert*, inasmuch as the latter case involved a group plan negotiated " 'between parties possessing parity of bargaining strength' " (*Baker, supra*, at p. 293) and that "*Herbert* acknowledges that an individual contract for medical services, as is involved here, should be more rigorously analyzed and less quickly applied to the claims of a nonsignatory." (*Id.* at p. 294.)

The *Baker* court went further, however, and declined to follow *Herbert*. (*Baker, supra*, 202 Cal.App.3d at p. 294.) "We must expressly decline to follow *Herbert*, however, in that it, as appellant argues, would apparently attempt, even in this situation, to force respondent herein to arbitrate solely to avoid litigation of these claims in two different tribunals." (*Ibid.*)

In *Gross v. Recabaren* (1988) 206 Cal.App.3d 771, 780–781 [253 Cal.Rptr. 820] (*Gross*), the husband filed a medical malpractice complaint related to his surgery, and his wife, a nonsignatory to the arbitration agreement, filed a loss of consortium claim. (*Id.* at p. 774.) Therefore *Gross,* like *Baker* and unlike *Herbert* and *Hawkins*, was a loss of consortium rather than wrongful death case. The *Gross* court was persuaded by *Herbert*'s construction of section 1295. Most significant for the court in *Gross* was the fact that a requirement that persons other than the patient sign the arbitration agreement in order to be bound by that agreement would result in a substantial loss of privacy to the patient. "[T]o authorize an intrusion into a patient's confidential relationship with a physician as the price for guaranteeing a third person, even a spouse, access to a jury trial on matters arising from the patient's own treatment, poses problems of a particularly serious nature. One might hope that spouses will voluntarily communicate with each other regarding their respective medical treatment, whether it involves a routine matter or a most intimate and sensitive procedure such as a vasectomy or the termination of a pregnancy. Nonetheless, it would be impermissible to adopt a rule that would

require them, or their physicians, to do so, or that would permit one spouse to exercise a type of veto power over the other's decisions. Yet construing section 1295 to require a spouse's concurrence in an arbitration agreement would, in certain situations at least, have exactly that effect." (*Gross, supra,* 206 Cal.App.3d at p. 782, italics omitted.)

Based on these considerations, the *Gross* court stated its holding broadly: "We therefore hold that where, as here, a patient expressly contracts to submit to arbitration 'any dispute as to medical malpractice,' and that agreement fully complies with Code of Civil Procedure section 1295, it must be deemed to apply to all medical malpractice claims arising out of the services contracted for, regardless of whether they are asserted by the patient or a third party." (*Gross, supra,* 206 Cal.App.3d at p. 781, italics omitted; accord, *Bolanos v. Khalatian* (1991) 231 Cal.App.3d 1586, 1591 [283 Cal.Rptr. 209].)

*Mormile v. Sinclair* (1994) 21 Cal.App.4th 1508 [26 Cal.Rptr.2d 725] (*Mormile*) also relied on section 1295 to conclude that a nonsignatory husband's loss of consortium claim was encompassed by his wife's arbitration agreement. "[I]f a spouse with a loss of consortium claim were allowed to litigate that claim, the purpose of section 1295 would be defeated, for the patient would be compelled to arbitrate, but the physician would still have to answer in a civil suit for claims dependent on identical facts regarding the professional standard of care, its breach by the defendant and causation of injury to the patient. No savings would be effected, and there would be the potential for an anomalous result: the patient might fail to establish liability in arbitration, while the nonsignatory spouse might prevail in the loss of consortium action." (*Mormile, supra,* 21 Cal.App.4th at p. 1515.)

In *Buckner v. Tamarin* (2002) 98 Cal.App.4th 140 [119 Cal.Rptr.2d 489] (*Buckner*) the nonsignatory adult children sued the health care provider for the wrongful death of their father. *Buckner* distinguished *Herbert.* "In *Herbert,* the wrongful death claimants fell into three groups. For two of those groups—the widow and minor children—the decedent's right to bind them to arbitration rested on well-grounded legal principles involving spouses and parents and children. For the third group, however—adult children who did not belong to the health plan—the decedent had no authority to act. The *Herbert* court nevertheless found that practical considerations involving the indivisibility of wrongful death claims permitted the arbitration agreement to sweep up the adult children. *Herbert*'s rationale is inapplicable here because respondents are not dividing their wrongful death claims between different forums. Accordingly, *Herbert* does not apply." (*Buckner, supra,* at p. 143.)

The court also rejected out of hand the broad language in *Mormile* suggesting that a wrongful death claimant could be bound by the patient's

arbitration agreement, concluding that such language was dicta and that *Mormile* was distinguishable in that it involved a spouse rather than the adult children. (*Buckner, supra*, 98 Cal.App.4th at pp. 143–144; see also *Goliger v. AMS Properties, Inc.* (2004) 123 Cal.App.4th 374, 377–378 [19 Cal.Rptr.3d 819] [following *Buckner* in holding that an adult cannot sign away the arbitration rights of another adult if not in an agency relationship].) Instead, *Buckner* affirmed the primacy of the rule that " 'a party cannot be compelled to arbitrate a dispute that he has not agreed to resolve by arbitration.' " (*Buckner, supra*, at p. 142.)[2]

## IV. DISCUSSION

■ Like the Courts of Appeal in *Herbert*, *Gross* and *Mormile*, we are persuaded that section 1295, construed in light of its purpose, is designed to permit patients who sign arbitration agreements to bind their heirs in wrongful death actions. There are several reasons supporting this conclusion. First, it is clear that section 1295 was intended to include the arbitration of wrongful death claims. As noted, section 1295, subdivision (a) contemplates arbitration "of any dispute as to professional negligence of a health care provider." " 'Professional negligence' " is defined in section 1295, subdivision (g)(2) as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury *or wrongful death*." (Italics added.) Also as noted, section 1295 was part of MICRA's efforts to control the runaway costs of medical malpractice, and that statute does so by promoting arbitration of malpractice disputes, while at the same time ensuring that patients are adequately informed of the consequences of entering into arbitration agreements. (*Reigelsperger, supra*, 40 Cal.4th at pp. 577–578.) The definition of professional negligence to include wrongful death was used throughout all the statutes enacted pursuant to MICRA. (See Bus. & Prof.

---

[2] Other jurisdictions have been divided on the question whether the decedent's arbitration agreement binds wrongful death plaintiffs. States that bind such plaintiffs generally view wrongful death claims as derivative of the decedent's claim, or focus on the public policy favoring arbitration agreements. (See *Graves v. BP America, Inc.* (5th Cir. 2009) 568 F.3d 221, 223; *Peltz v. Sears, Roebuck & Co.* (E.D.Pa. 2005) 367 F.Supp.2d 711, 718; *Briarcliff Nursing Home, Inc. v. Turcotte* (Ala. 2004) 894 So.2d 661, 665; *Allen v. Pacheco* (Colo. 2003) 71 P.3d 375, 379; *Ballard v. Southwest Detroit Hosp.* (1982) 119 Mich.App. 814, 819 [327 N.W.2d 370]; *In re Labatt Food Service, L.P.* (Tex. 2009) 279 S.W.3d 640, 644.) States that do not bind claimants generally emphasize the independence of the wrongful death claim or the need for consent in creating binding arbitration. (See *Woodall v. Avalon Care Center—Federal Way, LLC* (2010) 155 Wn.App. 919 [231 P.3d 1252]; see also *Lawrence v. Beverly Manor* (Mo. 2009) 273 S.W.3d 525, 527; *Peters v. Columbus Steel Castings Co.* (2007) 115 Ohio St.3d 134, 136 [2007 Ohio 4787, 873 N.E.2d 1258]; *Bybee v. Abdulla* (2008) 2008 UT 35 [189 P.3d 40] [emphasizing that wrongful death actions are authorized by the state constitution].) None of these cases, however, considered a medical malpractice arbitration statute of the kind found in section 1295.

Code, § 6146, subd. (c)(3); Civ. Code, § 3333.2, subd. (c)(2); Code Civ. Proc., § 340.5, subd. (2).) In light of the purpose and scope of the statute, it is not surprising that section 1295 does not distinguish between malpractice claims asserted by the patient or the patient's estate, and wrongful death claims arising out of alleged malpractice committed against the patient: it is evident that both sorts of claims are intended to be encompassed by agreements entered into pursuant to section 1295. It is also clear that other provisions of MICRA apply to wrongful death actions arising from medical malpractice. (See *Yates v. Pollock* (1987) 194 Cal.App.3d 195, 199 [239 Cal.Rptr. 383] [Civ. Code, § 3333.2's $250,000 cap on medical malpractice noneconomic damages applies in wrongful death actions].)[3]

Given this purpose of authorizing the arbitration of medical malpractice and wrongful death claims, we find persuasive the arguments advanced by the Courts of Appeal discussed above that requiring potential wrongful death claimants to be signatories to an arbitration agreement is highly problematic.

First, there is the matter of practicality: "[I]t is obviously unrealistic to require the signatures of all the heirs, since they are not even identified until the time of death, or they might not be available when their signatures are required. Furthermore, if they refused to sign they should not be in a position possibly to delay medical treatment to the party in need." (*Herbert, supra*, 169 Cal.App.3d at p. 725.)

■ Second, there are substantial privacy concerns, potentially "authoriz-[ing] an intrusion into a patient's confidential relationship with a physician." (*Gross, supra*, 206 Cal.App.3d at p. 782.) As we have recognized, the explicit right of privacy protected under California Constitution, article I, section 1, protects two classes of privacy interests: "(1) interests in precluding the dissemination or misuse of sensitive and confidential information ('informational privacy'); and (2) interests in making intimate personal decisions or

---

[3] At oral argument, Ruiz's counsel argued that by defining "professional negligence" in section 1295, subdivision (g)(2) to include an "act or omission [that] is the proximate cause of a personal injury or wrongful death," the statute did not mean to include wrongful death actions, but meant "wrongful death" in a more colloquial sense to refer to a survivor's action by the decedent's estate for the decedent's personal injury. The dissenting opinion makes a similar argument. (Dis. opn., *post*, at p. 857.) We are unpersuaded. A decedent's personal injury action does indeed survive the decedent's death and may be brought by his or her estate. (§§ 377.20, 377.30.) The term "wrongful death" is not used in the statutes defining a survivor action, but is reserved exclusively to refer to the independent actions of the decedent's heirs for their own injuries. (See *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1269 [45 Cal.Rptr.3d 222].) "[W]hen the Legislature uses a term of art, a court construing that use must assume that the Legislature was aware of the ramifications of its choice of language." (*Creutz v. Superior Court* (1996) 49 Cal.App.4th 822, 829 [56 Cal.Rptr.2d 870].) Here, the term "wrongful death" has a well-established meaning—an independent action by a decedent's heirs for injuries resulting from the decedent's death—and there is no indication the Legislature in using this term in section 1295 intended to depart from that meaning.

conducting personal activities without observation, intrusion, or interference ('autonomy privacy')." (*Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35 [26 Cal.Rptr.2d 834, 865 P.2d 633].) Both types of privacy interests are implicated here. Requiring patients to obtain the signatures of heirs would require to some degree the disclosure of confidential medical information regarding the condition a patient seeks to treat.[4] The disclosure of such sensitive medical information is at the core of the protected informational privacy interest. (See *Hill*, at p. 41.) The need to have other parties' signatures before obtaining medical treatment also fundamentally intrudes on the patient's interest in autonomy privacy. (See *American Academy of Pediatrics v. Lundgren* (1997) 16 Cal 4th 307, 340 [66 Cal.Rptr.2d 210, 940 P.2d 797].) Because the Legislature contemplated the inclusion of wrongful death claims within arbitration agreements drafted pursuant to section 1295, but obviously could not have intended that the patient's heirs be signatories to these arbitration agreements, we conclude the Legislature intended to permit patients to bind any heirs pursuing wrongful death actions to these agreements.

Moreover, although section 1295 is merely a permissive statute allowing patients and health care providers to enter into arbitration agreements with certain standards of disclosure, we agree with the court in *Mormile, supra,* 21 Cal.App.4th at page 1515, that if a spouse or adult children were permitted to litigate wrongful death or loss of consortium claims "the purpose of section 1295 would be defeated, for the patient would be compelled to arbitrate, but the physician would still have to answer in a civil suit for claims dependent on identical facts" and that "[n]o savings would be effected." Stated in other terms, section 1295, construed in light of its purpose, intends to give patients and health care providers the option of entering into an agreement that will resolve all medical malpractice claims, including wrongful death claims, by arbitration. Requiring that wrongful death claimants be bound by arbitration agreements only when they themselves have been signatory to them effectively forecloses that option for practical and public policy reasons.

On the other hand, the purpose behind the wrongful death statute, section 377.60, would not be undermined by construing section 1295 to permit the binding of wrongful death litigants to arbitration. Although a wrongful death claim is an independent action, wrongful death plaintiffs may be bound by agreements entered into by decedent that limit the scope of the wrongful death action. Thus, for example, although an individual involved in a

---

[4] As amici curiae California Medical Association et al. point out, even if the exact nature of the condition being treated or the procedure being performed could be concealed from relatives signing an arbitration agreement, merely the fact that a person is being treated by a health care provider with a certain specialty easily discoverable through an Internet search could reveal significant sensitive information.

dangerous activity cannot by signing a release extinguish his heirs' wrongful death claim, the heirs will be bound by the decedent's agreement to waive a defendant's negligence and assume all risk. (*Madison v. Superior Court* (1988) 203 Cal.App.3d 589, 597 [250 Cal.Rptr. 299]; *Scroggs v. Coast Community College Dist.* (1987) 193 Cal.App.3d 1399, 1402–1403 [239 Cal.Rptr. 916].) Wrongful death plaintiffs may be bound by defenses applicable to the decedent if the statute giving rise to the defense is construed to intend such application. (*Horwich, supra*, 21 Cal.4th 272, 287.)

■ It is true we have emphasized that arbitration derives its legitimacy from the fact that the parties consent to resort to the arbitral forum rather than to litigation, with its possibility of a jury trial. (*Baker, supra*, 202 Cal.App.3d at p. 291.) Such consent is generally required. But as discussed, the case law has recognized a number of instances in the health care setting in which agreements to arbitrate have bound nonsignatory third parties, including children both born and not yet born, spouses, and employees who are the beneficiaries of health care agreements between an employer and a group health plan. (See *Mormile, supra*, 21 Cal.App.4th at p. 1511, and cases cited therein; *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 242–243 [54 Cal.Rptr.2d 628] (*County of Contra Costa*).) Although these cases rely on common law principles such as fiduciary duty and agency, here the Legislature appears to have intended to create through statute for public policy reasons a capacity of health care patients to bind their heirs to arbitrate wrongful death actions. To so bind wrongful death plaintiffs does not in any sense extinguish their claims nor make them dependent on the outcome of the decedent's estate's litigation, and does not even restrict the scope of the wrongful death plaintiff's claims as in the above release cases, but merely requires that the claims "be resolved by a common, expeditious, and judicially favored method." (*Madden, supra*, 17 Cal.3d at p. 707.)

Plaintiffs point to our dictum that "the right to trial by jury is considered so fundamental that ambiguity in the statute permitting [jury trial] waivers must be 'resolved in favor of according to a litigant a jury trial.'" (*Grafton Partners v. Superior Court* (2005) 36 Cal.4th 944, 956 [32 Cal.Rptr.3d 5, 116 P.3d 479].) They argue that section 1295 does not explicitly provide for parties to an arbitration agreement pursuant to that section to bind their heirs who file wrongful death claims, and that we should require such explicit statutory authorization before requiring nonsignatories to be bound by arbitration agreements. As explained above, section 1295, construed in light of its overall purpose, is sufficiently clear in its inclusion of wrongful death claims to be understood as intending to permit patients to bind their heirs to health care arbitration agreements.

Finally, plaintiffs suggested in their briefs, and more explicitly at oral argument, that a rule permitting a person to bind his or her adult children to arbitration agreements would violate the state constitutional right to a jury trial. (Cal. Const., art. I, § 16.) That constitutional provision reads in pertinent part: "In a civil cause a jury may be waived by the consent of the parties expressed as prescribed by statute." (*Ibid.*) In *Madden*, we considered an employee's challenge to an arbitration agreement the Board of Administration of the State Employees Retirement System (Board) entered into on behalf of the employee as part of a larger agreement with a health plan for the provision of group medical services. We noted that in the Meyers-Geddes State Employees' Medical and Hospital Care Act (Gov. Code, former § 22751 et seq.), the Legislature entrusted to the Board the authority to make group medical plans available to state employees, but neither expressly granted nor withheld authority for the Board to agree to arbitration of employees' malpractice claims. The *Madden* court concluded that the Board possessed this authority because it acted as an agent and fiduciary on behalf of the employees. (*Madden, supra,* 17 Cal.3d at p. 709.) *Madden* further rejected the argument that the state constitutional right to a jury trial was violated by this arrangement, or by the failure to obtain from the employees a specific waiver of the jury trial right, recognizing that no such explicit waiver was required in civil cases. (*Id.* at p. 713, fn. 12.)

■ The right to a jury trial under the California Constitution generally applies to actions for damages that would have been tried to a jury at common law (see *Asare v. Hartford Fire Ins. Co.* (1991) 1 Cal.App.4th 856, 867 [2 Cal.Rptr.2d 452]), and wrongful death actions fall into that category. As *Madden* demonstrates, however, the Legislature may devise reasonable rules in civil litigation to permit the delegation to another party of the power to consent to arbitration instead of a jury trial. In *Madden*, the agency/principal relationship made the delegation reasonable. In the present case, the Legislature by statute has created the right of certain heirs to a wrongful death action and may also by statute place reasonable conditions on the exercise of that right. As discussed, the prerogative of patients to contract with health care providers regarding the terms of their medical care without third party interference is itself a right of constitutional dimension. The Legislature could reasonably delegate the authority to consent to arbitration of medical malpractice claims arising from patients' medical treatment to the patients themselves, particularly when such delegation furthers an important public policy. Moreover, as observed in *Herbert, supra,* 169 Cal.App.3d at page 725: "Decedents are able to bind their heirs through wills and other testamentary dispositions so the concept is not new or illogical." As in

*Madden,* we cannot say that under these particular circumstances this reasonable delegation of authority to enter into arbitration agreements violates the state constitutional right to a jury trial.[5]

■ Turning to the present case, as noted, the arbitration agreement "binds all parties whose claims may arise out of or relate to treatment or service provided by the physician including any spouse or heirs of the patient and any children" as well as specifically providing for arbitration of wrongful death and loss of consortium claims.[6] We hold that the agreement can be enforced, and that a contrary holding would defeat Podolsky's reasonable contractual expectations. We therefore reverse the Court of Appeal and order a remand with directions that Podolsky's petition to compel arbitration be granted as to all wrongful death claimants, including the adult children.

## V. DISPOSITION

The judgment of the Court of Appeal is reversed and the cause is remanded with directions to grant Podolsky's petition to compel arbitration of all wrongful death claims.

George, C. J., Baxter, J., Chin, J., Corrigan, J., and Scotland, J.,* concurred.

---

[5] We emphasize that our holding is limited to binding wrongful death claimants, who by statutory definition have a special relationship with the decedent, to arbitration agreements. Our holding does not extend to third parties who are strangers to the decedent and who file cross-claims in a medical malpractice case. (See *County of Contra Costa, supra,* 47 Cal.App.4th 237.)

[6] Of course, patients can bind their heirs to health care arbitration agreements only to the extent that the agreements between these patients and their health care providers are valid. Before this court, plaintiffs argue that the original arbitration agreement itself was defective, relying on the recent case of *Rodriguez v. Superior Court* (2009) 176 Cal.App.4th 1461 [98 Cal.Rptr.3d 728]. *Rodriguez* held that there is no conclusive presumption that a health care arbitration agreement conforming to section 1295 is valid, and that the presumption may be rebutted by a showing that the agreement to arbitrate was not knowingly and voluntarily made. (*Rodriguez, supra,* at pp. 1468–1469.) Focusing on the fact that the arbitration agreement was signed under pressured circumstances, and that the signator, because she died shortly after signing the arbitration agreement, never had the opportunity afforded by section 1295, subdivision (c), to rescind the agreement within 30 days, the court held the agreement to be unlawful. (*Rodriguez, supra,* at pp. 1469–1470.) Plaintiffs argue that Ruiz also had no opportunity to rescind the agreement within section 1295, subdivision (c)'s window. Podolsky argues that *Rodriguez* was incorrectly decided. We need not decide the issue. Plaintiffs never challenged the initial validity of the arbitration agreement and, as the Court of Appeal noted, conceded that it applied to the Wife. We decline to address this issue raised for the first time in this court.

*Presiding Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**KENNARD, J.,** Dissenting.—According to plaintiffs, defendant Anatol Podolsky, an orthopedic surgeon, negligently failed to diagnose and treat plaintiffs' father for a hip fracture, thereby causing his death. Plaintiffs are not suing for the injury inflicted upon their *father*; rather, they are suing for the injury that defendant inflicted directly upon *them* when he negligently deprived them of their father's companionship, care, and support. Plaintiffs never agreed to arbitrate these personal claims. The majority nevertheless holds that they must do so because their deceased father agreed *on their behalf* to arbitration, by signing a doctor-provided, preprinted form.

The portion of this form that refers to "heirs of the patient and any children" is written in fine print and buried in text that is laden with obscure legal terminology. More significant, the relevant language purports to relinquish the rights of persons who have *not signed* the agreement. The majority holds that the Legislature intended to allow patients to give up the jury trial rights of their family members by agreeing on their behalf to arbitration. The majority, however, has not cited a single statute stating or unambiguously implying any such rule. I disagree with the majority and would affirm the contrary holding of the Court of Appeal, which in turn affirmed the trial court.

## I

Plaintiffs' father, Rafael Ruiz, consulted orthopedic surgeon Anatol Podolsky about a hip fracture. At that time, Ruiz signed Podolsky's preprinted form, agreeing to arbitrate "any dispute as to medical malpractice." The form also warned that, by agreeing to arbitration, Ruiz and Podolsky were "giving up their constitutional right" to a jury trial. This warning is required by statute. (Code Civ. Proc., § 1295, subd. (a).) What follows this statutory warning is a lengthy text, written in small type, burdened with legal terms, and including an obscure provision binding Ruiz's heirs to arbitrate any claims for wrongful death. By contrast, this same obscure provision expressly permits *Podolsky* to avoid arbitration and take fee disputes to *court*.

Eight days after the signing of the form, Ruiz died. Blood clots caused by the hip fracture had broken loose and lodged in his pulmonary arteries. Ruiz's four adult children sued Podolsky for wrongful death, asserting that Podolsky had failed to adequately diagnose and treat the hip fracture. Relying on the arbitration agreement Ruiz had signed, Podolsky petitioned the trial court to compel arbitration.[1] The trial court denied the petition, concluding that Ruiz's

---

[1] Ruiz's spouse, who was also a plaintiff in the lawsuit, did not dispute Podolsky's contention that she was bound by the arbitration agreement.

children were not parties to the agreement, which therefore did not bind them. The Court of Appeal unanimously upheld that ruling.

## II

Arbitration agreements in medical services contracts are governed by Code of Civil Procedure section 1295 (hereafter section 1295), which was enacted as part of the Medical Injury Compensation Reform Act of 1975 (MICRA). (Stats. 1975, 2d Ex. Sess. 1975–1976, ch. 1, § 26.6, pp. 3975–3976.) Although section 1295 approves the use of arbitration agreements, it also reflects the Legislature's concern for protecting the rights of patients. It does so by requiring that certain warnings be set forth in the text of the agreement, one at the beginning and the other (in bold red type and capital letters) just before the signature line. Section 1295 does not mention heirs of the patient, much less discuss whether heirs may be compelled to arbitrate their claims. The majority nevertheless relies on this statute in concluding that a patient may agree on behalf of his or her heirs to arbitration of their wrongful death claims. The text of section 1295 suggests otherwise.

First, that statute requires that any arbitration agreement begin with an express warning stating that "[b]oth *parties* to [the] contract, by entering into it, are giving up *their* constitutional [jury trial] right . . . ." (§ 1295, subd. (a), italics added.) The "parties" referred to in this warning are obviously the physician and the patient. The warning says nothing about patients also giving up the rights of persons *not signing* the agreement. In addition, the express warning that must appear in bold red type immediately before the signature line provides that " 'BY SIGNING THIS CONTRACT *YOU* ARE AGREEING' " to neutral arbitration and " '*YOU* ARE GIVING UP *YOUR* RIGHT TO A JURY OR COURT TRIAL.' " (Code Civ. Proc., § 1295, subd. (b), italics added.) Again, nothing in this warning informs the patient that he or she is giving up the rights of persons *not signing* the agreement.

Second, those express warnings to patients do not anywhere mention wrongful death actions by the patient's heirs. The only reference in section 1295 to "wrongful death" appears not in the warnings that must be included in the text of the arbitration agreement and that the patient will therefore see, but in a definitions section of the statute that the patient could locate only by doing legal research. Specifically, subdivision (a) states that it governs agreements to arbitrate "professional negligence" disputes, and subdivision (g)(2) defines "professional negligence" as negligence of a health care provider that proximately causes "personal injury or *wrongful death*." (§ 1295, subd. (g)(2), italics added.) The reason for this reference to wrongful death is

that the *signatories* to the arbitration agreement—the physician and the patient—remain bound by the agreement even if the physician's alleged negligence leads to the patient's death. In other words, the phrase "wrongful death" in section 1295, subdivision (g)(2), is used in its plain sense, simply to recognize the possibility that the injured patient might die. The phrase clarifies that the death of the patient will not extinguish the contractual obligation to arbitrate the *patient's own* personal injury claim. Under California's survival statute, such claims are "not lost by reason of the [patient's] death."[2] (Code Civ. Proc., § 377.20.) In my view, the phrase does not refer to wrongful death *causes of action* (see Code Civ. Proc., § 377.60) brought by persons who have *not signed* the arbitration agreement. Such persons seek to vindicate *their own* independent claims, not the patient's personal injury claim. The majority nevertheless reads the statutory phrase as referring to wrongful death *causes of action* and concludes from that single ambiguous reference that a patient can agree on behalf of his or her heirs to arbitration of their wrongful death claims.

The majority's conclusion raises serious constitutional questions. The majority reasons that this vicarious waiver of important rights is constitutional because when the Legislature creates a statutory right (such as the right to recover for wrongful death), it may place limits on that right. (Maj. opn., *ante*, at pp. 853–854.) But this reasoning assumes that the Legislature actually intends to place the limits, and therefore we should at least find a clear statement of that intent. Here, the only specific statutory language that the majority points to as evidence of the Legislature's intent to permit the vicarious waiver of plaintiffs' rights is the ambiguous and unelaborated reference to "wrongful death" in section 1295's definition of "professional negligence." The majority's reasoning requires an implausible assumption. The majority assumes that, in crafting two detailed warnings to be included in the text of every medical services arbitration agreement, the Legislature omitted any mention that family members' rights might be relinquished.

The majority also relies on MICRA's purpose to rein in medical malpractice litigation costs (maj. opn., *ante*, at pp. 843, 850), concluding that "public policy" supports allowing "patients to bind their heirs to arbitrate wrongful death actions" (maj. opn., *ante*, at p. 852). The majority is correct about the general purpose of MICRA. (See *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 577–578 [53 Cal.Rptr.3d 887, 150 P.3d 764].) Nevertheless, the Legislature chose to achieve this purpose by way of specified changes in the law. Those changes include the one at issue here, authorizing and regulating

---

[2] If a plaintiff dies, his or her estate may prosecute the claim.

arbitration agreements between physicians and their patients. Not every rule that might in some way limit medical malpractice litigation costs can be read into the statutory scheme, and a rule permitting arbitration agreements to bind a patient's heirs was not among the changes the Legislature specified.

When parties have chosen to arbitrate instead of going to court, this court has held that the arbitrator's decision is final and enforceable as to those parties because they have so agreed. (*Berglund v. Arthroscopic & Laser Surgery Center of San Diego, L.P.* (2008) 44 Cal.4th 528, 539 [79 Cal.Rptr.3d 370, 187 P.3d 86] (*Berglund*).) Nevertheless, as this court has cautioned, "that policy does *not* extend to those who are *not* parties to the arbitration agreement and, by definition, have *not* consented to arbitration." (*Ibid.*, italics added.) Plaintiffs here were not parties to the arbitration agreement signed by their father. Not having consented, they are not bound.

Significantly, plaintiffs' claim is not derivative of any claim that their deceased father had, as would be true of a claim prosecuted under the survival statute. (See Code Civ. Proc., § 377.20.) Plaintiffs' wrongful death claim is independent, vindicating their own injuries, which arise from the effect that their father's death had on them personally. (See *Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283 [87 Cal.Rptr.2d 222, 980 P.2d 927] ["Unlike some jurisdictions wherein wrongful death actions are derivative, Code of Civil Procedure section 377.60 'creates a *new cause of action* in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived. [Citations.]' "].) Specifically, plaintiffs seek to recover for the loss they suffered personally by being deprived of their father's companionship, care, and support.

The majority asserts, "[I]f a spouse or adult children were permitted to litigate wrongful death or loss of consortium claims 'the purpose of section 1295 would be defeated, for the patient would be compelled to arbitrate, but the physician would still have to answer in a civil suit for claims dependent on identical facts' and . . . '[n]o savings would be effected.' " (Maj. opn., *ante*, at p. 851, quoting *Mormile v. Sinclair* (1994) 21 Cal.App.4th 1508, 1515 [26 Cal.Rptr.2d 725].) Although that may sometimes be true, the situation is by no means unusual. Often disputes involve multiple parties, only some of whom have agreed to arbitrate. (See *Berglund*, *supra*, 44 Cal.4th 528.) That parallel proceedings might defeat some of the savings associated with arbitration has never been a reason to force arbitration upon parties that did not agree to it.

## III

For the reasons stated above, I dissent. I would affirm the Court of Appeal, which in turn affirmed the trial court.