Filed 12/8/21  L.L. v. Orinda Care Center CA1/1
### NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| L.L., et al.,<br>      Plaintiffs and Respondents,<br>v.<br>ORINDA CARE CENTER, LLC, et al.,<br>      Defendants and Respondents. | A163601<br><br>(Contra Costa County Super. Ct. No. MSC21-00589) |

After suffering a stroke, plaintiff L.L.[1] was admitted to the Orinda Care Center LLC (Orinda), a skilled nursing facility.  In the pending action, she alleges violation of the Patient's Bill of Rights,[2] elder abuse/neglect, and negligence.  Her daughter, Regina, is also a plaintiff and alleges a cause of action for negligent infliction of emotional distress.

Orinda brought a motion to compel arbitration of all causes of action based on L.L.'s admission documentation.  The trial court denied the motion, ruling (a) Regina, who executed the documentation, did not have authority to

---

[1]  To protect plaintiff's privacy interests, we refer to her by her initials, and to protect the privacy interests of her immediate family, we refer to them by their first names.  (Cal. Rules of Court, rule 8.90 (b)(2), (8).)

[2]  Health and Safety Code section 1430, subdivision (b); California Code of Regulations, title 22., section 72527.

1

bind L.L. to arbitration, and (b) Regina did not sign the arbitration agreement in her individual capacity. We affirm.

## BACKGROUND

L.L. was admitted into Orinda in March 2019, after suffering a stroke. At the time, she was "half unconscious" and had "difficulty understanding English." She also had a PEG tube for feeding and an in-dwelling Foley catheter due to incontinence.

A few days after L.L.'s admission, Orinda gave Regina a "package of admission documents" and told her she "had to sign all fields which required a signature." L.L. had no power of attorney or advance health care directive at the time, nor was she a conservatee.[3]

Regina signed the admission agreement as "Resident Representative." The agreement explained, "References to the 'Resident's Representative' are references to [Regina], the person who will sign on your behalf to admit you to this Facility, and/or who is authorized to make decisions for you in the event you are unable to. To the extent permitted by law, you may designate a person as your Representative at any time."

One of the documents Regina signed was titled "Resident-Facility Arbitration Agreement." It provided in part: "any dispute as to medical malpractice . . . [¶] . . . [or] any dispute between Resident and Facility, including any action for injury or death arising from negligence, intentional tort and/or statutory causes of action . . . will be determined by submission to arbitration as provided by California law and not by lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Resident and Facility, as parties to this agreement, are giving

---

[3] Regina applied to be appointed L.L.'s guardian ad litem in order to file this lawsuit.

up their Constitutional rights to have a dispute under this agreement decided in a court of law before a jury, and instead are accepting the use of arbitration. . . . [¶] . . . [¶] Agreement to arbitrate is not a precondition for medical treatment or for admission to this facility. [¶] . . . This agreement may be rescinded by written notice within thirty (30) days of signature. This Agreement is binding on all parties, including their personal representatives, successors, family members, and heirs. [¶] . . . [¶] You do not, however, give up your right to sue for a violation of the Patient's Bill of Rights."[4] (Capitalization & color text omitted.)

The arbitration agreement further provided "The undersigned certifies that he/she . . . is either the Resident, or is the representative of the Resident, duly authorized to execute the above and accept its terms." Regina signed the agreement as the "Resident Representative." L.L. did not sign the agreement.

Regina also signed a Physician Orders for Life-Sustaining Treatment form (POLST) on L.L.'s behalf in March 2019.

L.L. was discharged multiple times from Orinda in order to be admitted to the hospital. Orinda "had a rule that every time [L.L.] was admitted to the hospital they did not need to hold her bed for more than 7 days." After four of the discharges which were longer than seven days, Orinda presented new readmission documents, which included new arbitration agreements, for signature. Each time L.L. was admitted to Orinda, "she was not able to sign

---

[4] Orinda does not dispute that the arbitration agreement does not apply to L.L.'s cause of action for violation of the Patient's Bill of Rights. Instead, it maintains the trial court should have stayed that claim "until after the rest of [plaintiffs'] claims have been fully arbitrated." L.L. asserts the converse: "any arbitrable claims must be stayed" until the remaining claims are tried. As we shall explain, we need not and do not reach that issue.

3

because she suffered from dementia; therefore the documents were presented to [L.L.'s son Leonid] or . . . Regina to sign. [She] was unable to tell the staff if she wanted [Regina or Leonid] to sign the documents for her."

Due to COVID-19 restrictions, Leonid could not visit L.L. at Orinda for several months. When Leonid was able to visit in April 2021 he "was told [he] needed to sign admission documents for her July 30, 2020 and September 9, 2020 admissions which had not yet been signed." Leonid signed the admission documents but refused to sign the arbitration agreements.

In April 2021, Regina signed an "Attestation of Responsible Party" which stated in part: "I attest I am the Responsible Party as indicated above for [L.L.] who was admitted to Orinda Care Center on 9/9/20. I have the authority to sign the Admission Agreement and to make medical decisions for [L.L.]"

In March 2021, L.L. and Regina filed suit against Orinda, with Regina acting as L.L.'s guardian ad litem. They alleged Orinda failed to monitor L.L.'s PEG tube, resulting in L.L. being hospitalized with sepsis due to her PEG tube feeding into her peritoneal cavity rather than her stomach. They also alleged Orinda failed to monitor, prevent, and treat L.L.'s pressure ulcers, and that Orinda failed to provide adequate catheter care, resulting in infection and acute kidney failure.

After defendants filed an answer, they filed a petition to compel arbitration. The trial court denied the petition. It found it "was undisputed that [L.L.] did not sign an arbitration agreement, . . . [¶] . . . [¶] . . . [and] no evidence shows [L.L.] authorized Regina, or anyone else, to act on her behalf." The court ruled, in turn, that Regina's ability to make certain medical decisions for her mother L.L., "including signing a 'Physician Orders for Life

4

Sustaining Treatment form,' " did not mean Regina had "the ability to commit her mother to arbitration."

## DISCUSSION

### *Actual Authority*

Orinda maintains the court erred in ruling Regina had no actual or ostensible authority to sign the arbitration agreement on behalf of L.L.

" ' "Generally speaking, one must be a party to an arbitration agreement to be bound by it or invoke it." [Citations.] "There are exceptions to the general rule that a nonsignatory to an agreement cannot be compelled to arbitrate and cannot invoke an agreement to arbitrate, without being a party to the arbitration agreement." ' [Citation.] ' " 'As one authority has stated, there are six theories by which a nonsignatory may be bound to arbitrate: "(a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary." ' " ' " (*Pillar Project AG v. Payward Ventures, Inc*. (2021) 64 Cal.App.5th 671, 675 (*Pillar Project*).) " ' " " 'Whether an arbitration agreement is binding on a third party (e.g., a nonsignatory) is a question of law subject to de novo review.' " ' " (*Ibid*.)

Orinda maintains Regina had both "actual authority to sign the arbitration agreement" and ostensible authority to do so. "Actual authority arises as a consequence of conduct of the principal which causes an agent reasonably to believe that the principal consents to the agent's execution of an act on behalf of the principal. [Citations.] Similarly, ostensible authority arises as a result of conduct of the principal which causes the third party reasonably to believe that the agent possesses the authority to act on the principal's behalf." (*Tomerlin v. Canadian Indemnity Co*. (1964) 61 Cal.2d 638, 643 (*Tomerlin*), italics omitted; Civ. Code, §§ 2316, 2317.)

5

Courts have generally concluded that, where a patient has not designated a relative as an agent or given them power of attorney, that relative has no authority to enter into an arbitration agreement on behalf of the patient.  (*Goldman v. Sunbridge Healthcare, LLC* (2013) 220 Cal.App.4th 1160, 1176–1177 (*Goldman*); *Pagarigan v. Libby Care Center, Inc.* (2002) 99 Cal.App.4th 298, 301–303 (*Pagarigan*); *Warfield v. Summerville Senior Living, Inc.* (2007) 158 Cal.App.4th 443, 448–449 (*Warfield*).)

In *Goldman,* the decedent's wife (Wife) sued two skilled nursing facilities on behalf of her husband for elder abuse, fraud, and violations of the Patient's Bill of Rights, and on her own behalf for negligent infliction of emotional distress and wrongful death.  (*Goldman*, *supra*, 220 Cal.App.4th at pp. 1165–1166.)  Wife had signed an arbitration agreement as part of the facility's documentation.  (*Id.* at p. 1166.)  Her husband had executed a "Durable Power of Attorney for Health Care and Living Will" that appointed Wife as "his health care agent in the event he became unable to make decisions for himself."  (*Ibid.*)  Wife declared " 'a person from the facility merely told me that I needed to sign some more forms for my husband.  The person . . . did not say what the forms were, that they involved arbitration, or that there was a choice. . . .  The person . . . never inquired of me whether my husband was capable of signing the documents. . . .  Had this issue been raised, I certainly would have told the facility employee that my husband was capable of making his own health care decisions.' "  (*Id.* at pp. 1166–1167.)

The court concluded Wife was not authorized to sign the arbitration agreement on Husband's behalf.  It pointed out there was no evidence Husband lacked the capacity to make his own decisions, and therefore Wife had no power to bind Husband under the durable power of attorney and advance directive.  (*Goldman*, *supra*, 220 Cal.App.4th at pp. 1170–1171.)

6

Wife likewise had no inherent authority as a spouse to contractually bind Husband to the arbitration agreement, and there was no evidence Husband conferred authority on Wife as his agent to sign the arbitration agreement. (*Id*. at pp. 1171–1172.)  The court also rejected the facilities' claim that "labeling [Wife] as [Husband's] 'representative' somehow conferred upon her the decisionmaking authority he expressly retained for himself." (*Id*. at p. 1174.)

Similarly, in *Pagarigan,* two daughters signed an arbitration agreement with a skilled nursing facility after their mother was admitted. (*Pagarigan, supra*, 99 Cal.App.4th at pp. 300, 301–302.)  Mother "was mentally incompetent at the time she was admitted . . . [and] [t]here was no evidence [she] had signed a durable power of attorney." (*Id*. at p. 301.)  The court concluded "It necessarily follows [their mother] lacked the capacity to authorize either daughter to enter into the arbitration agreements on her behalf." (*Ibid*.)  The court also rejected the facility's claim of actual or ostensible agency, stating there was "no evidence [their mother] had ever employed either of her daughters as her agent in any capacity.  Nor did [the facility] produce any evidence this comatose and mentally incompetent woman did anything which caused them to believe either of her daughters was authorized to act as her agent in any capacity." (*Id*. at p. 302.)  Lastly, the court rejected the facility's claim that the daughters' authority as "next of kin" to "make medical treatment decisions for the patient at the request of the treating physician translates into authority to sign an arbitration agreement on the patient's behalf." (*Ibid*.)

Likewise, in *Warfield,* the court rejected a residential care facility's claim that a husband had authority to sign an arbitration agreement binding his wife, both as her spouse and her "ostensible agent." (*Warfield*, *supra*,

7

158 Cal.App.4th at pp. 446, 448–449.) The court observed " ' " 'formation of an agency relationship is a bilateral matter. Words or conduct by both principal and agent are necessary to create the relationship.' " ' " (*Id.* at p. 448, italics omitted.) Because "the facility has presented absolutely no evidence of the wife's 'express or implied consent to have her husband act as her agent,' " the arbitration agreement did not bind the wife. (*Ibid.*)

Orinda nevertheless claims, here, that Regina had both actual and ostensible authority to sign the arbitration agreement and bind her mother. Relying on two much older cases—*Tomerlin, supra,* 61 Cal.2d 638 and *County First National Bank v. Coast Dairies & Land Co.* (1941) 46 Cal.App.2d 355 (*First National*)—Orinda asserts L.L. "conferred actual authority on Regina to sign the arbitration agreement despite there not being an official power of attorney."

The issue in *Tomerlin* was whether "an attorney hired by an insurance company to defend an insured possesse[d] the authority to bind the insurer with regard to coverage of the policy." (*Tomerlin*, *supra*, 61 Cal.2d at p. 643.) Because the attorney had informed the insured's personal attorney that the insurance company " 'was continuing without a reservation of rights to defend the action,' " the insured permitted his personal attorney to withdraw from the case. (*Id.* at p. 642.) After the plaintiff dismissed the negligence counts against the insured, the insured asked the attorney if " 'this changed the picture as far as [the] insurance coverage was concerned, and he said no, that the coverage is still the same.' " (*Ibid.*) Immediately after the verdict against the insured, the attorney also assured the insured's wife that "the insurance company remained liable." (*Ibid.*) A month later, however, the attorney informed the insured that the insurer "disclaimed any liability to pay the . . . judgment." (*Ibid.*)

8

The trial court found the attorney's representations were binding on the insurance company, and that the insured had permitted his personal attorney to withdraw in reliance on those representations. (*Tomerlin*, *supra*, 61 Cal.2d at p. 643.)

On appeal, the court explained the claim that the attorney lacked authority to bind the insured was "a challenge to the sufficiency of the evidence; we need therefore determine only whether the record contains any substantial evidence to support the findings of the trial court." (*Tomerlin*, *supra*, 61 Cal.2d at p. 643.)

The court indicated substantial evidence supported the trial court's finding of both actual and ostensible authority. The evidence showed the insurer engaged the attorney to represent the insured in the lawsuit and to represent its own interests. (*Tomerlin*, *supra*, 61 Cal.2d at p. 644.) The insurer "failed to notify [the attorney] of any actual limitations upon his authority although it knew [the attorney] concerned himself with the question of policy coverage and, indeed, had notified [the insurer] that its reservation of rights agreement was ineffective." (*Ibid*.) There was "a volume of correspondence between [the attorney] and [the insurer] concerning coverage problems. [The insurer's] silence in the face of this continuing correspondence could reasonably cause [the attorney] to believe that he possessed actual authority to represent [the insurer] in his relations with [the insured] concerning questions of coverage." (*Ibid*.)

As to ostensible authority, the court concluded the insurer's "conduct in retaining [the attorney] and in remaining silent in the face of actual knowledge of [the attorney's] participation in coverage problems constitutes sufficient evidence to sustain a finding of ostensible authority." (*Tomerlin*, *supra*, 61 Cal.2d at pp. 644–645.)

In *First National*, the general manager of a land company executed a promissory note on its behalf. (*First National*, *supra*, 46 Cal.App.2d at p. 357.) The trial court found the general manager had neither express nor implied authority to execute the note. (*Ibid.*)

The Court of Appeal reversed. (*First National*, *supra*, 46 Cal.App.2d at p. 367.) The undisputed facts showed the general manager had been acting as such for over 10 years. (*Id.* at p. 358.) He was in "full charge of all of the company's affairs," including the corporate records and seal and finances of the company, fixing and collecting rentals, negotiating for the sale of real estate, making investments for the company, keeping the company books, and settling litigation. (*Ibid.*) Signature cards were filed with the bank authorizing the general manager to draw checks on the land company's account. All correspondence with the bank for over 10 years was "over [his] signature, and during all of such period he conducted business with the bank personally and by correspondence as the general manager of the company." (*Ibid.*) The vice-president knew the general manager "signed notes and renewal notes on behalf of [the land company], and that this was done with his full knowledge and permission." (*Ibid.*) While there was no authorization at the bank permitting the general manager to "borrow for the account of the company, the renewals [of the note], which preserved the credit of the company, were without dissent on [the company's] part, and payments thereon . . . were made through [the general manager] for the account of the company." (*Id.* at p. 360.) The company did not repudiate any of the general manager's dealings with the bank on its behalf over the course of more than a decade. (*Id.* at pp. 360–361.)

The facts in *Tomerlin* and *First National* bear no resemblance to the case at hand. There is no dispute that L.L. had not granted Regina power of

10

attorney, had not executed an advance health care directive, and was not a conservatee. There is no evidence she ever authorized Regina to bind her contractually, no evidence Regina had ever done so before, and no evidence that she was aware that Regina was so acting and acquiesced. Indeed, at the time L.L. was admitted to Orinda, she had suffered a stroke, was "half unconscious," and had difficulty understanding English. She also suffered from dementia and was unable to tell the staff if she wanted her children to sign any documents for her.

Despite L.L.'s undisputed medical and cognitive issues, Orinda claims L.L. "had a general idea of Regina's actions in signing the arbitration agreement." It also asserts "[d]espite understanding that she had been admitted and readmitted to Orinda to receive medical care, [L.L.] did not object to or attempt to limit Regina's power to make medical decisions and to sign medical documents on [her] behalf." Orinda concludes "[i]t is thus apparent that [L.L.] conferred implied actual authority onto Regina to make medical decisions on [her] behalf."

Orinda provides no citation to the record for these factual claims, nor could it. There is simply no evidence in the record L.L. "had a general idea of Regina's actions in signing the arbitration agreement," or understood she was being "admitted and readmitted to Orinda to receive medical care" but failed to object to Regina signing documents on her behalf. Indeed, all evidence is to the contrary.

### Ostensible Authority

Orinda alternatively claims Regina had ostensible authority to sign the arbitration agreement.

" 'An agency is ostensible when the principal intentionally, or by want of ordinary care, causes a third person to believe another to be his agent who

11

is not really employed by him.' [Citation.] 'A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof.' (Civ. Code, § 2334.) 'Before recovery can be had against the principal for the acts of an ostensible agent, three requirements must be met: The person dealing with an agent must do so with a reasonable belief in the agent's authority, such belief must be generated by some act or neglect by the principal sought to be charged[,] and the person relying on the agent's apparent authority must not be negligent in holding that belief.' " (*Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1038 (*Markow*).)

Orinda claims it was led to believe "Regina had the necessary authority to sign the arbitration agreement . . . [because she] signed an attestation stating that she was [L.L.'s] princip[al] medical decisionmaker." Orinda cites the "Attestation of Responsible Party" signed by Regina, which states in part: "I attest that I am the Responsible Party as indicated above for [L.L.] who was admitted to Orinda Care Center on 9/9/2020. I have the authority to sign the Admission Agreement and to make medical decisions for [L.L.]."[5] The document indicates it was signed on April 15, 2021. Orinda also asserts Regina's execution of the POLST and "other medical documents," combined with L.L.'s "failure to limit her daughter's authority in any way" led Orinda "to reasonably believe [Regina] had [the] authority to sign the arbitration agreement."

---

[5] Regina maintains the attestation form in the record cited by Orinda "was actually signed by [L.L.'s] son, Leonid." Although the signature is not legible, the form itself indicates it was signed by Regina as L.L.'s daughter. Even if the attestation form was signed by Leonid rather than Regina, it has no effect on our conclusion as to the claim of ostensible authority.

12

Orinda's ostensible agency theory suffers from two fatal flaws.  The first is that ostensible agency cannot be predicated on action of the supposed agent, but " 'must be generated by some act or neglect by *the principal* sought to be charged' " (*Markow, supra,* 3 Cal.App.5th at p. 1038, italics added.)  "A person cannot become the agent of another merely by representing herself as such." (*Pagarigan*, *supra*, 99 Cal.App.4th at p. 301.)  Orinda has pointed to no evidence of any " 'act or neglect' " (*Markow*, at p. 1038) *by L.L.* that could generate a reasonable belief that Regina was her agent for purposes of signing the arbitration agreement.  Orinda's reliance on the attestation form, signed by Regina, is not evidence of any act or neglect *by L.L.*  To quote *Pagarigan*, Orinda does not explain "how the next of kin's authority to make medical treatment decisions for the patient . . . translates into authority to sign the arbitration agreement." (*Pagarigan*, at p. 302.)

The second flaw in Orinda's claim is that the attestation form provides no evidence that *L.L.* had given Regina authority to make decisions for her regarding arbitration agreements.  It states only that Regina is the "Responsible Party as indicated above" with "authority to sign the Admission Agreement and to make medical decisions for [L.L.]."  "[A]s indicated above" refers to the section in the attestation agreement indicating "Relationship to patient."  That section identified Regina as "Family Member . . . daughter," rather than the other choices of "Durable Power of Healthcare," "Power of Attorney," or "Legal Guardian."

Furthermore, the attestation form was not signed at the time of L.L.'s initial admission in March 2019, when Regina signed the arbitration agreement; rather, it was signed more than two years later.  Thus, even if the attestation indicated Regina had power to sign an arbitration agreement,

13

which it did not, it certainly does not indicate she had authority to sign an arbitration agreement two years earlier.

### *Ratification*

Orinda additionally maintains L.L. ratified Regina's action in signing the arbitration agreement. Orinda claims L.L. "ratified Regina's action in signing the arbitration agreement by accepting the benefits of staying at Orinda . . . by continuing to reside at Orinda . . . [and by] not attempt[ing] to rescind the arbitration agreement withing 30 days of Regina signing it and . . . not tak[ing] action to prevent Regina from making medical decisions for her while she stayed at Orinda." Orinda asserts L.L. "must have had knowledge that she was staying at Orinda and that various medical documents needed to be signed to allow her to continue staying at Orinda."

" ' "The fundamental test of ratification by conduct is whether the releasor, with full knowledge of the material facts entitling him to rescind, has engaged in some unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a ratification.' " [Citations.] Where, as here, '[t]here is no evidence [the principal] knew the arbitration agreements existed, that [the agent] signed them, or that [the principal] had a right to rescind them,' no ratification has occurred." (*Pillar Project*, *supra*, 64 Cal.App.5th at pp. 676–677, italics omitted.)

Orinda points to no evidence that L.L. knew the arbitration agreement existed, knew that Regina signed it, or knew that she had the right to rescind it. Indeed, the evidence was to the contrary: L.L. was recovering from a stroke, "half unconscious," unable to speak or sign documents, and suffering from dementia. Orinda concedes in its opening brief that L.L. was "suffering from numerous medical ailments and was incapacitated at the time of her

14

admission to Orinda." There was simply no evidence L.L. ratified Regina's signing of the arbitration agreement.[6]

### *Regina's NIED Claim*

Orinda lastly claims that, at the very least, Regina's cause of action for negligent infliction of emotional distress is subject to arbitration. It maintains that, because "Regina signed a valid arbitration agreement that included a clause stating it would be binding on [L.L.'s] family members, the *Ruiz* [*v. Podolsky* (2010) 50 Cal.4th 838 (*Ruiz*)] case mandated that Regina's personal injury claim be arbitrated."

*Ruiz* does not aid Orinda. In *Ruiz*, a patient's wife and children filed a medical malpractice and wrongful death action against his physician. (*Ruiz*, *supra*, 50 Cal.4th at p. 842.) The patient had signed an arbitration "agreement [that] provided for the arbitration of any malpractice claims. . . . The agreement further provided that it was the intention of the parties 'that this agreement binds all parties whose claims may arise out of or relate to treatment or service provided by the physician including any spouse or heirs of the patient and any children, whether born or unborn, at the time of the occurrence giving rise to the claim.' Elsewhere the agreement specifically provided for arbitration of wrongful death and loss of consortium claims." (*Id*. at pp. 841–842.)

The high court considered whether Code of Civil Procedure section 1295 applied. That provision mandates that specific language be included in "[a]ny contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider" and it

---

[6] Given our disposition as to L.L., we need not and do not address her claims that the arbitration agreement was unconscionable, was not operative once she was hospitalized and readmitted to Orinda, and Orinda unreasonably delayed in moving for arbitration.

defines " '[p]rofessional negligence' " as "a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death." (Code Civ. Proc., § 1295, subd. (g)(2).) It further provides "Such a contract is not a contract of adhesion, nor unconscionable nor otherwise improper, where it complies with . . . this section." (Code Civ. Proc., § 1295, subd. (e).) Code of Civil Procedure section 1295 was " 'enacted as part of the Medical Injury Compensation Reform Act of 1975. . . . The purpose of section 1295 is to encourage and facilitate arbitration of medical malpractice disputes.' " (*Ruiz*, *supra*, 50 Cal.4th at pp. 843–844.)

Our Supreme Court concluded "[Code of Civil Procedure] section 1295, construed in light of its overall purpose, is sufficiently clear in its inclusion of wrongful death claims to be understood as intending to permit patients to bind their heirs to health care arbitration agreements." (*Ruiz*, *supra*, 50 Cal.4th at p. 852.)

The critical difference between *Ruiz* and this case is that the patient, L.L., did not sign the arbitration agreement, and therefore she could not, and did not, bind Regina to the arbitration agreement. Accordingly, *Ruiz* does not, contrary to Orinda's claim, "mandate[] that Regina's personal injury claim be arbitrated."

## DISPOSITION

The order is affirmed. Costs on appeal to respondents.

16

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Sanchez, J.

A163601, LL et al v. Orinda Care Center LLC

17