Filed 3/14/25  Zalazar v. G;endale Post Acute Center CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| MARIA ZALAZAR et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>GLENDALE POST ACUTE CENTER et al.,<br><br>Defendants and Appellants. | B329783<br><br>(Los Angeles County<br>Super. Ct. No. 21STCV35909) |

APPEAL from an order of the Superior Court of Los Angeles County, Michelle W. Court and Ralph C. Hofer, Judges. Affirmed.

Lewis Brisbois Bisgaard & Smith, Lann G. McIntyre, Tracy D. Forbath, Suzanne L. Schmidt and Kathleen M. Walker for Defendants and Appellants.

Robins Cloud, Brian K. Teets, Jr. and Manuel D. Balam for Plaintiffs and Respondents.

―――――――――――――――

Julio Zalazar was a resident at Glendale Post Acute Center, a skilled nursing facility. After Zalazar passed away, his three children and heirs—Maria, Raul, and Julio Jr.[1]—filed a lawsuit in the superior court against Glendale Post Acute Center; LAC Verdugo Operations, LLC; LAC SNF, LLC; and Jocelyn Arevalo. In their complaint, the Zalazar children alleged that defendants' negligence and substandard care caused Zalazar's death. Defendants petitioned to compel arbitration, arguing that the parties were bound by arbitration agreements signed by Julio Jr. as Zalazar's purported representative. The superior court denied the petition, concluding (among other things) defendants failed to prove that Julio Jr. had actual or ostensible authority to execute the arbitration agreements or that Julio Jr.—or any of the Zalazar heirs—signed the arbitration agreements in an individual capacity. We agree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Following a series of strokes and other limiting conditions, Zalazar was admitted to Glendale Post Acute Center. As part of the admission process, Zalazar's son, Julio Jr., completed paperwork, including two arbitration agreements. One arbitration agreement covered medical malpractice and the other covered disputes other than medical malpractice, including claims alleging violations of the Elder Abuse and Dependent Adult Civil Protection Act. The agreements state that the resident agrees to have any issue or claim "decided by neutral arbitration, and gives up the right to a jury or court trial."

---

[1] Because Zalazar's children all share his same last name, we refer to them by their first names.

Zalazar's name was printed on the "Resident Name" line on both documents, but he did not sign either one. "Julio Jr. Zalazar" was written on the "Resident Representative Name" line. Julio Jr.'s putative signature appears on the "Signature" lines intended for the resident, but handwritten arrows direct his signature down to the "Resident Representative Signature" lines on each form. Directly above the signature block, each of the pre-printed forms includes the following language: "By virtue of Resident's consent, instruction and/or durable power of attorney, I hereby certify that I am authorized to act as Resident's agent in executing and delivering of this arbitration agreement." Around the same time, Julio Jr. appears to have signed over 20 other intake documents as "Resident's Representative."

Almost two years after being admitted to Glendale Post Acute Center, Zalazar died.

Maria, Raul, and Julio Jr., as Zalazar's heirs and in their individual capacities, filed a complaint against defendants, alleging: (1) wrongful death (as elder abuse under Welfare & Institutions Code section 15600 et seq.); (2) violations of the Elder Abuse and Dependent Adult Civil Protection Act (under Welfare & Institutions Code section 15600 et seq.); (3) violations of Health & Safety Code section 1430, subdivision (b); and (4) wrongful death (by negligence).

Defendants filed a petition to compel the matter to arbitration. In support of their petition, defendants attached the two arbitration agreements and the other intake documents signed by Julio Jr. The superior court denied the petition to compel arbitration, concluding that defendants failed to meet their burden of establishing Julio Jr. was Zalazar's agent when he signed the arbitration agreements. The court also determined

3

the Zalazar children did not sign any agreement in an individual capacity.  In addition, the superior court explained that, even if there were an enforceable arbitration agreement, the court would exercise its discretion under Code of Civil Procedure section 1281.2, subdivision (c),[2] and "decline[] to order any portion of the matter to arbitration, given the risk of inconsistent rulings if the claims are to proceed in different forums."[3]

Defendants timely appealed.

## DISCUSSION

A.    *Governing Law and Standard of Review*

"[S]ections 1281.2 and 1290.2 create a summary procedure for resolving petitions to compel arbitration upon submitted evidence."  (*Rogers v. Roseville SH, LLC* (2022) 75 Cal.App.5th 1065, 1072 (*Rogers*); accord, *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)  Generally, "when a petition to compel arbitration is filed and accompanied by prima facie evidence of a written agreement to arbitrate the controversy, the court itself must determine whether the agreement exists and, if any defense to its enforcement is raised, whether it is enforceable.  Because the existence of the agreement is a statutory prerequisite to granting the petition, the petitioner bears the burden of proving its existence by a preponderance of the evidence."  (*Rosenthal v. Great Western Fin. Securities*

---

[2]    Undesignated statutory references are to the Code of Civil Procedure.

[3]    Because we conclude the superior court correctly denied the petition to compel arbitration on the other grounds, we do not reach this alternative basis for denial.

4

*Corp.* (1996) 14 Cal.4th 394, 413; accord, *Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 586 (*Flores*).)

"'"[T]he right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties."' [Citation.] '"The question of whether a valid agreement to arbitrate exists is determined by reference to the law applicable to contracts generally."'" (*Kinder v. Capistrano Beach Care Center, LLC* (2023) 91 Cal.App.5th 804, 811 (*Kinder*).)

"'There is no uniform standard of review for evaluating an order denying a [petition] to compel arbitration.'" (*Lopez v. Bartlett Care Center, LLC* (2019) 39 Cal.App.5th 311, 317 (*Lopez*), internal quotation marks omitted.) "[I]f the court's denial rests solely on a decision of law, then a de novo standard of review is employed." (*Ibid.*, internal quotation marks omitted; accord, *Garcia v. KND Development 52, LLC* (2020) 58 Cal.App.5th 736, 744 (*Garcia*) ["We review de novo the legal conclusions underlying a trial court's denial of a petition to compel arbitration"].) "If the court's order is based on a decision of fact, then we adopt a substantial evidence standard." (*Lopez*, at p. 317.)

We review this matter de novo because the superior court's ruling was based primarily on a question of law: whether defendants presented sufficient evidence to carry their burden to prove that Julio Jr. was his father's agent when he signed the arbitration agreements. (*Kinder, supra,* 91 Cal.App.5th at p. 811; see also *Trinity v. Life Ins. Co. of North America* (2022) 78 Cal.App.5th 1111, 1121 ["'[w]hen, as here, the court's order denying a motion to compel arbitration is based on the court's finding that petitioner failed to carry its burden of proof, the

5

question for the reviewing court is whether that finding was erroneous as a matter of law'"].)

B.  *The Superior Court Correctly Determined Defendants Failed To Show Zalazar Agreed To Arbitrate*

Defendants argue the arbitration agreements, other intake documents, and Zalazar's conduct (or inaction) demonstrated Julio Jr. was his father's authorized agent and bound Zalazar to arbitration.  We agree with the superior court that defendants' showing was insufficient.

1.  *The Law of Agency*

"'Generally, a person,'" like Zalazar, "'who is not a party to an arbitration agreement is not bound by it.  [Citation.] However, there are exceptions.  For example, . . . a person who is authorized to act as the [resident or] patient's agent can bind the [resident or] patient to an arbitration agreement.'"  (*Rogers*, *supra*, 75 Cal.App.5th at p. 1074; accord, *Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1128 ["'Even the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement'"]; *Bouton v. USAA Casualty Ins. Co.* (2008) 43 Cal.4th 1190, 1199 ["'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate'"]; *Flores*, *supra*, 148 Cal.App.4th at p. 587.)

"An agent is one who represents another, called the principal, in dealings with third persons.  [Citation.]  In California, an agency is either actual or ostensible.  [Citation.] Actual agency arises when the principal's conduct causes the

6

agent reasonably to believe that the principal consents to the agent's act on behalf of the principal. [Citations.] Ostensible agency arises when the principal's conduct causes the third party reasonably to believe that the agent has the authority to act on the principal's behalf." (*Rogers*, *supra*, 75 Cal.App.5th at p. 1074, internal quotation marks omitted.)

"An agency, whether actual or ostensible, cannot be created by the conduct of the agent alone; rather, conduct by the principal is essential to create the agency. [Citations.] The principal must in some manner indicate that the agent is to act for the principal, and the agent must act or agree to act on the principal's behalf and subject to the principal's control. [Citations.] Thus, the formation of an agency relationship is a bilateral matter. Words or conduct by both principal and agent are necessary to create the relationship." (*Rogers*, *supra*, 75 Cal.App.5th at p. 1074, internal quotation marks, ellipses, and brackets omitted.)

As the parties seeking arbitration, defendants bear the burden of proving Julio Jr. was Zalazar's actual or ostensible agent. (*Rogers*, *supra*, 75 Cal.App.5th at p. 1074.) Defendants "do[] not meet [their] burden of proving the existence of an arbitration agreement when [they fail to] present [sufficient] evidence that the purported principal's conduct caused the agent or the third party to believe that the agent had the authority to bind the principal." (*Id.* at p. 1075.)

2. *Defendants Did Not Present Sufficient Evidence of Actual or Ostensible Agency*

According to defendants, the evidence demonstrated Julio Jr. was his father's actual agent because Julio Jr. signed the arbitration agreements below recitals that stated, "By virtue of

7

Resident's consent, instruction and/or durable power of attorney, I hereby certify that I am authorized to act as Resident's agent in executing and delivering of this arbitration agreement." In addition, Julio Jr. signed more than 20 other intake documents, on which Julio Jr. represented he was authorized to act on Zalazar's behalf. Defendants further contend that it is reasonable to infer that Zalazar authorized Julio Jr. to act as his agent because he "allowed" it. In the alternative, defendants argue that Julio Jr. was Zalazar's ostensible agent. None of defendants' contentions avails them.

For starters, Julio Jr.'s representation that he was Zalazar's agent does not make it so. It is well settled, as a general principle of contract law and in the context of arbitration agreements executed by a resident's family member upon admission to a nursing facility, that "[a] person cannot become the agent of another merely by representing herself as such." (*Pagarigan v. Libby Care Center, Inc.* (2002) 99 Cal.App.4th 298, 301 (*Pagarigan*) [adult children's signature not evidence of actual authority to enter into arbitration agreement]; accord, *Kinder*, *supra*, 91 Cal.App.5th at pp. 812–813; *Valentine v. Plum Healthcare Group, LLC (*2019) 37 Cal.App.5th 1076, 1087 (*Valentine*) [husband's signature on a line marked "resident's representative" beneath language stating the signatory had authority to enter into arbitration agreement on the patient's behalf was insufficient to establish agency]; *Flores*, *supra*, 148 Cal.App.4th at p. 588 [similar].) For the same reason, it makes no difference that Julio Jr. also made that representation on several other intake forms he signed at the same time.

Moreover, defendants presented no evidence in support of their contention that Zalazar "allowed" Julio Jr. to act on his

8

behalf. As the superior court observed, "there is no evidence offered, either in the moving papers, or in the reply, supporting any argument concerning what [Zalazar] did or did not do in connection with the representation of [Zalazar] by his son throughout the transaction or at any time." Indeed, defendants have not shown that Zalazar ever authorized Julio Jr. to act as his agent or to bind him contractually, or that Zalazar was even aware that Julio Jr. signed the arbitration agreements (or the other intake documents) on his behalf. (See *Rogers*, *supra*, 75 Cal.App.5th at p. 1076 ["There was no evidence that [the resident] approved similar acts by [his son] in the past or that [the resident] remained silent even though he knew that [his son] had signed the arbitration agreement on his behalf"].)

Finally, defendants also presented insufficient evidence Julio Jr. was his father's ostensible agent. Citing section 2317, defendants argue "[o]stensible agency is established when the principal intentionally, *or by want of ordinary care*, causes a third person to believe the agent possesses certain authority." According to defendants, "want of ordinary care" can be inferred because Zalazar "made no effort to object to or disavow Julio Jr.'s conduct." Defendants cite no evidence supporting this assertion. Regardless, as we explained in *Kinder*, *supra*, 91 Cal.App.5th at page 816, "[a] defendant cannot prove a plaintiff consented to arbitration merely by showing the plaintiff stood idly by while the purported agent signed on his or her behalf." (See also *Rogers*, *supra*, 75 Cal.App.5th at p. 1076 [rejecting similar argument]; *Goldman v. Sunbridge Healthcare, LLC* (2013) 220 Cal.App.4th 1160, 1173 [rejecting facility's argument the patient's "silence on the matter [should] be considered to be an adoptive admission of the arbitration agreements signed by" the

9

patient's wife]; *Valentine, supra,* 37 Cal.App.5th at pp. 1088–1089 ["Contrary to defendants' argument, [the patient]'s silence in this instance was insufficient to convey ostensible authority to [her husband] to execute arbitration agreements on her behalf"].)

C.    *The Superior Court Correctly Ruled the Zalazar Children's Individual Wrongful Death Claims Were Not Subject to Arbitration*

Defendants further argue that at the very least the Zalazar children's individual wrongful death claims are subject to the medical malpractice arbitration agreement under section 1295. This argument also fails because defendants again presented insufficient evidence Zalazar signed the arbitration agreement directly or through Julio Jr. as his agent (which would have bound Zalazar's estate and heirs). Nor was there sufficient evidence Julio Jr. signed the arbitration agreement in his individual capacity or that his siblings signed any agreement at all.

"Unlike some jurisdictions wherein wrongful death actions are derivative, section 377.60 'creates a new cause of action in favor of the heirs as beneficiaries, based upon their own independent pecuniary injury suffered by loss of a relative, and distinct from any the deceased might have maintained had he survived.'" (*Horwich v. Superior Court* (1999) 21 Cal.4th 272, 283; accord, *Hass v. RhodyCo Productions* (2018) 26 Cal.App.5th 11, 25 ["wrongful death claims 'are not derivative claims but are independent actions accruing to a decedent's heirs'"].)

Defendants contend the medical malpractice arbitration agreement encompasses the individual wrongful death claims because it specifies "[t]his arbitration agreement binds the

10

parties hereto, including the heirs, representative, executors, administrators, successors, and assigns of such parties."  Citing *Ruiz v. Podolsky* (2010) 50 Cal.4th 838 (*Ruiz*), defendants argue that "[s]ince the [medical malpractice arbitration agreement] was entered pursuant to section 1295 and the agreement specifies that it is binding on [Zalazar]'s heirs, the heirs are bound by the agreement."  Section 1295, subdivision (a), deals with "[a]ny contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider."

In *Ruiz, supra*, 50 Cal.4th 838, the patient signed an arbitration "agreement [that] provided for the arbitration of any malpractice claims. . . .  The agreement further provided that it was the intention of the parties 'that this agreement binds all parties whose claims may arise out of or relate to treatment or service provided by the physician including any spouse or heirs of the patient and any children, whether born or unborn, at the time of the occurrence giving rise to the claim.'  Elsewhere the agreement specifically provided for arbitration of wrongful death and loss of consortium claims." (*Id.* at pp. 841–842.)  The Supreme Court held "that all wrongful death claimants are bound by arbitration agreements entered into pursuant to section 1295, at least when . . . the language of the agreement manifests an intent to bind these claimants." (*Id.* at p. 841.)  "'Section 1295 was enacted as part of the Medical Injury Compensation Reform Act of 1975 (MICRA). . . .  The purpose of section 1295 is to encourage and facilitate arbitration of medical malpractice disputes,'" because it "furthers MICRA's goal of reducing costs in the resolution of malpractice claims and therefore malpractice insurance premiums." (*Id.* at pp. 843–844.)

Unlike in *Ruiz*, Zalazar did not sign the medical malpractice arbitration agreement (either directly or through an agent, as discussed above) and thus expressed no intent to arbitrate claims brought on his behalf. (See *Goldman v. Sunbridge Healthcare, LLC*, *supra*, 220 Cal.App.4th at p. 1177 ["Unlike the circumstance in *Ruiz*, [patient] did not agree to arbitrate and thus did not bind any successor in interest to arbitrate claims on his behalf"].) For the same reason, the recent decision in *Holland v. Silverscreen Healthcare, Inc.* (2024) 101 Cal.App.5th 1125 (*Holland*), review granted August 21, 2024, S285429, does not assist defendants either. In *Holland*, unlike here, the heirs were compelled to arbitrate their wrongful death claims because they were bound by an arbitration agreement signed by the decedent himself. (*Id.* at p. 1128.)

The Zalazar heirs also did not agree to arbitrate their individual claims. Julio Jr. signed the arbitration agreement as "Resident Representative," not in his individual capacity; and there is no language in the arbitration agreement indicating the "Resident Representative" agrees to arbitrate claims brought in his or her individual capacity. (See *Goliger v. AMS Properties, Inc.*, *supra*, 123 Cal.App.4th at p. 377 ["We now turn to arbitration of [decedent's daughter]'s personal claim for her mother's wrongful death. [Decedent's daughter] signed the arbitration forms in her capacity as her mother's 'responsible party.' Nothing on the arbitration form indicates she signed in her personal capacity"]; accord, *Fitzhugh v. Granada Healthcare & Rehabilitation Center, LLC* (2007) 150 Cal.App.4th 469, 471–474 [husband's wrongful death claims was not subject to arbitration in absence of evidence he signed arbitration agreements in his individual capacity].) The other Zalazar

children did not sign any documents in any capacity at all and therefore could not have agreed to arbitrate their individual claims.

Furthermore, unlike in *Ruiz*, here the wrongful death allegation in the complaint is primarily based on elder "abuse and neglect," not professional malpractice. (*Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 842 (*Avila*) ["If the primary basis for the wrongful death claim sounds in professional negligence as defined by MICRA, then section 1295 applies. If, as plaintiffs claim here, the primary basis is under the Elder Abuse and Dependent Adult Civil Protection Act . . . then section 1295 does not apply and neither does *Ruiz*'s exception to the general rule that one who has not consented cannot be compelled to arbitrate"].)

*Daniels v. Sunrise Senior Living* (2013) 212 Cal.App.4th 674 (*Daniels*) is instructive. In *Daniels*, a woman was admitted to a residential care facility for the elderly. (*Id.* at p. 677.) Upon admission, her daughter and attorney in fact, Daniels, signed a residency agreement with an arbitration clause binding the parties and their "'spouse, heirs, representatives, executors, administrators, successors and assigns.'" (*Id.* at p. 678.) After her mother's death, Daniels brought survivor and wrongful death claims. (*Ibid.*) In affirming denial of arbitration, the court explained *Ruiz* did not apply to wrongful death claims: "More generally, we disagree that *Ruiz* should be extended to arbitration agreements not governed by section 1295, or that are entered into with a person other than a health care provider for claims other than medical malpractice." (*Id.* at p. 683; see also *Valentine, supra*, 37 Cal.App.5th at p. 1084 ["a patient of a skilled nursing facility can bind her heirs to arbitrate wrongful death

13

claims arising only from medical malpractice, but not from elder abuse"].)

Defendants argue plaintiffs' wrongful death causes of action trigger section 1295, partially based on the complaint's allegation that defendants "'breached their duties of care by negligently . . . and/or improperly providing care, services and/or treatment'" to Zalazar. Although there is "at least some overlap between" professional negligence and elder abuse (*Avila, supra*, 20 Cal.App.5th at p. 843), in our view this case is pleaded as one for wrongful death, negligence, and elder abuse primarily based on neglect. This is not a case where plaintiffs allege Glendale Post Acute Center's "staff actively undertook to provide treatment" and did so in a substandard manner. (See *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 408.) Nor is the complaint "replete with references to the extensive medical care . . . received." (See *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 223.) Rather, the complaint asserts defendants negligently "breached and failed to meet their duties" to Zalazar "in several ways," alleging they "withheld and failed to provide basic and necessary care," "withheld and failed to implement or provide illness and infection control policies," "withheld necessary or appropriate care and treatment," and "failed to observe and report changes of conditions to family and physicians."

As *Avila* explains, such allegations "'"speak[] not of the undertaking of medical services, but of the failure to provide medical care."'" (*Avila, supra*, 20 Cal.App.5th at p. 843; accord, *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 89 ["Our Supreme Court teaches that neglect under the Act 'refers not to the substandard performance of medical services but, rather, to

14

the "failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations." [Citation.]  Thus, the statutory definition of "neglect" speaks not of the undertaking of medical services, but of the failure to provide medical care"]; but see *Holland*, *supra*, 101 Cal.App.5th at pp. 1133–1134 ["bare bones" claim alleging neglect and wrongful death "sounds in professional negligence"].)

* * *

In sum, defendants failed to establish Julio Jr. had actual or ostensible authority to bind Zalazar to arbitration, and they also failed to establish any of Zalazar's heirs agreed to arbitrate their individual wrongful death claims.  The superior court properly denied the petition to compel arbitration.

## DISPOSITION

The order denying the petition to compel arbitration is affirmed.  Respondents are entitled to recover their costs on appeal.

PULOS, J.[*]

We concur:

MARTINEZ, P. J.                    STONE, J.

---

[*]     Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

15